

**SIGNED this 17th day of January, 2013**

_____
John C. Cook
UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **Nathan Alexander Jones** | ) | **No. 12-14608** |
| | ) | **Chapter 13** |
| **Debtor** | ) | |
| _____ | ) | |
| | ) | |
| **In re:** | ) | |
| | ) | |
| **Teresa Gail Hillis** | ) | **No. 12-15179** |
| | ) | **Chapter 13** |
| **Debtor** | ) | |

### M E M O R A N D U M

These cases are before the court on the motions of creditor Auto Loan Finance for relief from the automatic stay filed on October 25, 2012. The creditor claims that its collateral, which the debtors intend to retain under the terms of their respective chapter 13 plans, does not constitute property of the debtors' bankruptcy estates. Because each motion raises an identical question of the law, the court consolidated the motions for hearing and will address each in this opinion,

which constitutes the court's findings of fact and conclusion of law in accordance with Rule 52 of the Federal Rules of Civil Procedure, made applicable in bankruptcy contested matters by Rules 9014(c) and 7052 of the Federal Rules of Bankruptcy Procedure.

**I.**

Debtors Nathan Jones and Teresa Hillis each obtained an automobile from Auto Loan Finance, a dealership located in Cartersville, Georgia, after conducting an online search and completing a credit application on a third-party's website. Each debtor was contacted by a representative of the creditor and was informed that he or she was pre-approved for financing. After selecting a vehicle from the creditor's inventory, each debtor then entered into a Bill of Sale, Simple Interest Retail Installment Contract, Promissory Note and Repayment Agreement, and Bailment Agreement with the creditor for the purchase of an automobile. Each debtor also completed and executed another credit application, on a form entitled "Independent Dealer's Advantage, LLC Customer Statement." Thereafter, each debtor made a payment to Auto Loan Finance and left the dealership with the automobile that was the subject of his or her respective contract. Mr. Jones left with his vehicle on August 15, 2012, and Ms. Hillis took possession of hers on September 8, 2012.

Each Bill of Sale obligated the debtor to purchase a specific vehicle for a specific price.[1] The debtor could only cancel the sale agreement if the creditor increased the cash delivered price. The Bills of Sale also states:

---

[1] Thus, the Bills of Sale were actually in the nature of purchase agreements – a bilateral contract providing for the seller to sell and the buyer to buy property under the terms and conditions stated therein – rather than a true bill of sale – a unilateral instrument whereby the sale and transfer of title is actually effected.

      5. . . . . If Purchaser is buying the motor vehicle in a credit sale transaction with Seller, which is evidenced by an executed installment sale contract, this agreement will not remain binding if a third party finance source does not agree to purchase the installment sale contract based on this agreement.

      6. If for any reason, Seller and Purchaser do not complete the motor vehicle sale and purchase, or a third party finance source does not agree to purchase the installment sale contract, Purchaser agrees to return the motor vehicle to Seller within 24 hours of notice or demand by Seller. Purchaser agrees to pay Seller on demand all reasonable charges and expenses for any damage to the motor vehicle. If Purchaser fails to return the motor vehicle within 24 hours of notice or demand, Purchaser agrees that Seller may, in its sole discretion, cancel the sale and retake immediate possession of the motor vehicle. In such event, Purchaser agrees to pay Seller all reasonable expenses incurred in connection with retaking the motor vehicle, including attorney's fees and other expenses to the extent permitted by applicable law.

Each Bill of Sale incorporates the related retail installment contract and provides that, if the terms of those documents are in conflict, the terms of the retail installment contract prevail. The Bill of Sale also states that it is governed by Georgia law.

Each retail installment contract sets forth the debtor's promise to pay the Amount Financed and the Finance Charge to the order of the "holder" (defined as Auto Loan Finance, or its assignee if the contract is assigned). The contract contains federal truth in lending disclosures, including the amount financed, annual percentage rate, finance charges and payment schedule. The form also states: "This contract and the related documents that you sign contemporaneously with this contract contain the entire agreement between you and us relating to the sale and financing of the motor vehicle." Each installment contract granted the creditor a security interest in the vehicle being acquired and provides for acceleration and/or repossession upon default. The contract does not contain any provision conditioning the sale on the purchase of the installment contract by a third-party finance company. Auto Loan Finance's representative acknowledged on cross-examination that each contract, in a paragraph entitled "OWNERSHIP AND RISK OF

-3-

LOSS," provides that the risk of loss passed to the debtors. The retail installment contracts also state that they are governed by Georgia law.

The installment contracts were signed by the seller, but they include a box allowing the seller to sell and assign "all right, title and interest in this contract to IDA ('Assignee')[2] in accordance with and under the terms and conditions of a separate agreement between Seller and Assignee" upon the signature of the seller in that box. No signature appears in the box on either contract, and the dealerships' Sales Manager testified that the contracts were never assigned to IDA and that the dealer never received payment for the contracts from IDA since the debtors failed to make certain initial payments as set forth below.

Each debtor also executed a Bailment Agreement, which states that it "is attached to and forms a part of that certain sales agreement" between the debtor and the creditor. The Bailment Agreement provides:

> Pending credit approval of buyer(s) by financing institution and completion of sales transaction, delivery of said vehicle by dealer is hereby made to buyer(s) as a convenience to buyer(s) and is subject to all terms and conditions in said sales agreement and in the promissory note and the security agreement, if any, executed concurrently or in accordance therewith. Said vehicle shall remain the property of the dealer. Buyer(s) represent(s) that all statements made in his/their loan application(s) are true and correct, and dealer makes delivery of said vehicle in reliance upon their [] truth and correctness. **Any untrue or incorrect statement or any other misrepresentation of buyer(s) in said application or in any other aforesaid documents shall entitle dealer, at his discretion, to immediately rescind the sale. This BAILMENT AGREEMENT expires in sixty (60) days from the date below.**
>
> Upon rescinding of the sale, buyer(s) shall promptly return said vehicle to dealer at dealer's address in good condition. Buyer(s) shall be liable to dealer for any and all damages to, destruction to, abuse of, excessive wear and/or excessive mileage

---

[2] The "buyback" letters discussed below show that "IDA" is Independent Dealer's Advantage, LLC.

> and use as described herein shall be promised when the total miles which said vehicle is driven while in buyer(s) possession exceeds an average of twenty (20) miles for each day in the buyer(s) possession. In the event that the average mileage exceeds the aforementioned total, the buyer(s) is/are responsible to pay upon demand, the rate of $.25 (cents) per mile in excess of the average daily figure by the number of days that the vehicle is in buyer(s) possession, multiplied by twenty (20), which sum shall then be added to any amounts owed for damage, destruction an/or abuse. All funds on deposit with the dealer shall be applied to the monies due dealer and the balance may, at the dealers option, be held by dealer for excessive damages. However, if said sums are insufficient the dealer may proceed against the buyer(s) by other legal remedies to fully recover its losses. If the dealer is able to provide the buyer(s) with financing according to the terms set forth in the sales agreement, said sales agreement shall be binding upon buyer(s) and enforceable by dealer.

Like the installment sales contract, the Bailment Agreement does not mention the purchase of the installment sales contract by a third party as a condition of the sale.

While at the dealership, Auto Loan Finance tells purchasers that it retains title to the cars until the loan is "finalized" with the third-party lender and that the loan would be finalized if the purchaser made the first two payments under the promissory note and the first payment under the retail installment contract, and if the information in the credit application was true and correct. The dealer also conducted "exit interviews" with the debtors and, in that connection, the debtors initialed documents stating that they understand that, "[b]y signing the Bailment Agreement, you understand that the vehicle is still the property of A.L.F. until A.L.F. is paid by the lender. A.L.F. can not [*sic*] be paid until you have fulfilled ALL of the lenders [*sic*] requirements."

Mr. Jones made both payments due under the promissory note, but filed a chapter 13 petition on September 7, 2012. He failed to make the first payment on the retail installment contract, which was due on October 1, 2012. Ms. Hillis made the first payment under the promissory note. She did not make the second payment under the note, which was due on October 5, 2012,

and at some point the dealership notified her that she must return the vehicle to the dealership.[3] On October 8, 2012, Ms. Hillis filed for bankruptcy relief, and she has not returned the vehicle. By letters dated November 9, 2012, Independent Dealer's Advantage informed Auto Loan Finance that both accounts would "be a buyback due to the customer not making their first payment as agreed on the contract."

Auto Loan Finance acknowledges that, after the execution of documents by the debtors, but prior to being informed of the "buyback," it submitted documents to have liens noted on the certificates of title to the vehicles. Those documents indicate that Mr. Jones purchased his vehicle on August 15, 2012, and that Ms. Hillis purchased hers on September 8, 2012. According to the dealer, both applications were rejected; the creditor resubmitted its paperwork for notation on the vehicle in the possession of Mr. Jones on September 13, 2012, and the vehicle in the possession of Ms. Hillis on September 25, 2012.

## II.

### A.

The question before the court is whether the vehicles are property of the debtors' bankruptcy estates. The Uniform Commercial Code provides when title to goods will pass from a seller to a buyer. Section 2-401 states, in pertinent part:

> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract . . ., and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these

---

[3] It is unclear whether Auto Loan Finance's demand that Ms. Hillis return the vehicle was made before or after the commencement of her chapter 13 case and there is no evidence that the creditor ever did demand the return of Mr. Jones's vehicle.

> provisions and to the provisions of the article on secured transactions . . ., title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.
>
> (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his or her performance with reference to the physical delivery of the goods, despite any reservation of a security interest . . . .

Ga. Code Ann. § 11-2-401. Thus, under subsection (2), a buyer and seller may agree as to when and how title to goods will pass. However, this freedom of contract is limited by subsection (1), which states that title cannot pass prior to identification of goods and that title may not be retained by the seller after delivery of the identified goods to the buyer. In other words, subsection (2) provides a default rule regarding the passage of title, when the parties have not made an explicit agreement as to when title will pass. In no event, however, may a seller retain title after the delivery of the goods, despite an explicit reservation of title. *Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Family Corp.)*, 407 B.R. 65, 78 (Bankr. D. Vt. 2009); *Malloy v. Brazeal (In re Callahan)*, No. 07-1021-R, 2007 WL 3018946, at *4-5 (Bankr. N.D. Okla. Oct. 11, 2007); *Pro Page Partners, LLC. v. Message Express Paging Co., Inc. (In re Pro Page Partners, LLC)*, 270 B.R. 221, 228-230 (Bankr. E.D. Tenn. 2001); *In re J. Adrian Sons, Inc.,* 205 B.R. 24, 26-27 (Bankr. W.D.N.Y. 1997); *Jahn v. Quintrell (In re Tom Woods Used Cars, Inc.)*, 21 B.R. 560, 565 (Bankr. E.D. Tenn. 1982). In fact, one bankruptcy court has stated that the holdings of bankruptcy cases interpreting section 2-401 are "uniform" – the seller cannot retain title after delivery of the goods. *Nanak Resorts*, 407 B.R. at 75.

To avoid the result required by UCC section 2-401, Auto Loan Finance argues that any agreement to sell a vehicle to one of the debtors "was conditioned and contingent upon acceptance of financing." According to the creditor, because "financing was not approved, the con-

dition was not satisfied and there were and are no binding and enforceable contracts of sale."

Some courts *have* held that parties may circumvent the operation of section 2-401 by creating conditions precedent to contract formation. *See Weaver v. Ford Motor Credit Co. (In re McFarland)*, 131 B.R. 627 (E.D. Tenn. 1990), *aff'd,* 943 F.2d 52 (6th Cir. 1991); *Weaver v. FDIC (In re Weaver)* No. 94-60116, 1995 WL 17005345, at *3 (Bankr. S.D. Ga. Mar. 30, 1995). *But see In re Jeans*, 326 B.R. 722 (Bankr. W.D. Tenn. 2005) (distinguishing the facts of *McFarland* and noting the difference between a conditional contract and a contract subject to a condition). Other courts have held that a bailment or delivery agreement executed contemporaneously with a binding installment contract creates a condition subsequent, which does not prevent contract formation. *See, e.g., Muhammad v. Bedford Nissan, Inc.,* No. 1:11-CV-1947, 2012 WL 33010, at *4 (N.D. Ohio Jan. 6, 2012) (holding that a delivery agreement created a condition subsequent and citing similar holdings by other courts).

Georgia state law recognizes that contracts may be subject to a condition precedent that prevents contract formation until the condition is satisfied. *See Sw. Life Ins. Co. v. Middle Ga. Neurological Specialists*, 416 S.E.2d 496, 497 (Ga. 1992); *State Farm Mut. Auto. Ins. Co. v. Sargent*, 354 S.E.2d 833, 834 (Ga. Ct. App. 1982). Section 13-3-4 of the Official Code of Georgia Annotated explains the difference between conditions precedent and conditions subsequent:

> Conditions may be precedent or subsequent. A condition precedent must be performed before the contract becomes absolute and obligatory upon the other party. The breach of a condition subsequent may destroy the party's rights under the contract or may give a right to damages to the other party, according to a true construction of the intention of the parties.

"Georgia law favors conditions subsequent rather than precedent and favors remediation by damages rather than forfeiture." *King Indus. Realty, Inc. v. Rich,* 481 S.E.2d 861, 864 (Ga. Ct. App. 1997). The Georgia Court of Appeals has expounded on the foregoing principles as follows:

> Conditions precedent, which are not favored in interpreting contracts, are created by language such as "on condition that," "if," and "provided," or by explicit statements that certain events are to be construed as conditions precedent. . . . If the contract's terms are clear and unambiguous and do not clearly establish a condition precedent, [the court] cannot construe the contract to create one.

*Choate Constr. Co. v. Ideal Elec. Contractors, Inc.*, 541 S.E.2d 435, 438 (Ga. Ct. App. 2000).

**B.**

The court's task is to determine (a) what conditions are set forth in the documents executed in connection with the transaction, (b) whether the conditions were conditions precedent or conditions subsequent, and (c) whether any such conditions were satisfied by the time the debtors filed their bankruptcy petitions. Two of the four principal documents include a total of three conditions pertinent to these cases.[4]

The first condition is contained in the Bill of Sale, which says that, if the vehicle is being purchased on credit, "this agreement will not remain binding if a third party finance source does not agree to purchase the installment sale contract based on this agreement." This provision indicates that the sale *is* binding unless and until a third party finance source declines to take an assignment of the retail installment contract, and so clearly reflects a condition subsequent. Because Independent Dealer's Advantage had *not* declined to take assignments of the contracts at

---

[4] The other two documents – the retail installment contract and the promissory note – do not include any "condition" language whatsoever.

-9-

the time the bankruptcy petitions were filed, the condition was not satisfied so the agreement "remain[ed] binding" when these cases were commenced.

The second condition is also contained in the Bill of Sale, which states that, if the parties do not "complete the motor vehicle sale and purchase, or a third party finance source does not agree to purchase the installment sale contract," the purchaser will return the vehicle within 24 hours after notice or demand. Then, if the purchaser fails timely to comply with the notice or demand, the seller "may, in its sole discretion, cancel the sale and retake immediate possession of the motor vehicle." Again, the language reflects a condition subsequent, such that the sale could be "canceled" under certain circumstances. Moreover, each sale and purchase *was* completed, in that the parties executed the retail installment contracts, and Independent Dealer's Advantage did *not* reject the contracts by the time the debtors filed their chapter 13 petitions,[5] so the dealer had no right to demand the return of the vehicles. Even if Auto Loan Finance had had a right to demand returns of the vehicles, there is no evidence that it made such a demand of Mr. Jones or that, after making demand of Ms. Hillis, it then exercised its right to cancel the transaction.

The third condition is contained in the second paragraph of the Bailment Agreement, which states that the "sales agreement shall be binding upon buyer(s) and enforceable by dealer" if "the dealer is able to provide the buyer(s) with financing according to the terms set forth in the

---

[5] The court's determination that the transaction was completed subject to the occurrence of a condition subsequent finds further support in the title applications that Auto Loan Finance submitted: those applications reflect sale dates, identify the debtors as the "owners," and indicate that IDA was the lienholder.

sales agreement."[6] Because the only third party financing contemplated in these agreements was a purchase of the installment contracts by Independent Dealer's Advantage, this third condition must be read in conjunction with the first condition stated in the Bill of Sale, namely, that "this agreement will not remain binding if a third party finance source does not agree to purchase the installment sale contract based on this agreement." The only way to reconcile the phrase "shall be binding upon buyer(s) and enforceable by dealer" in the Bailment Agreement with the phrase "will not remain binding" in the Bill of Sale is to construe the former phrase to mean "shall *continue* to be binding upon buyer(s) and enforceable by dealer" if the third party financing is obtained. In other words, the language contained in the Bailment Agreement does not lead to a conclusion that the third party financing condition, namely, the purchase of the contracts by Independent Dealer's Advantage, was a condition precedent to the formation of the contracts in these cases. Rather, the third party financing contemplated by these agreements was a condition subsequent to the formation of the contracts.

Auto Loan Finance also relies on (i) its representatives' oral statements informing each debtor that a third-party lender would "approve the financing" if the debtor made the first two payments under the promissory note and the first payment under the retail installment contract, and if the information in the credit application was true and correct, and (ii) the acknowledgments in the "exit interview" statements that the vehicle remains property of the dealer until it is paid by the third-party finance company. The court does not interpret the oral statements as

---

[6] The first paragraph of the Bailment Agreement providing that, pending "credit approval" and "completion of sales transaction," the vehicle is delivered to the buyer as a convenience to him or her and is "subject to all the terms and conditions in the sales agreement," and that the "vehicle shall remain the property of the dealer," is simply an attempt to reserve title in the seller contrary to the terms of UCC section 2-401(1). Ga. Code Ann. § 11-2-401.

conditions to the formation of the contracts, but only as providing the debtors with some guidance as to what normally must be done for a third-party finance company to agree to purchase a retail installment contract. Moreover, the dealer's representations to the debtors that the vehicles would remain property of the dealer until the dealer was paid by the lender was, in light of Ga. Code Ann. § 11-2-401(1), an unsuccessful attempt by the dealer to retain titles to the vehicles after entering into binding contracts with the buyers and delivering the vehicles to them.

Finally, Auto Loan Finance relies on *Farmer v. Autorics, Inc. (In re Branam)*, 247 B.R. 440 (Bankr. E.D. Tenn. 2000), a decision rendered by Judge Stair of this court. The pertinent contractual language in that case stated: "THIS IS NOT AN ORDER UNTIL ACCEPTED BY AN OFFICIAL OF THE COMPANY, AND CREDIT APPROVED BY A RESPONSIBLE FINANCE COMPANY AS TO ANY DEFERRED BALANCE." The credit application had not been approved by a finance company by the time the purchaser's bankruptcy petition was filed. *Id.* at 445. Relying on *Weaver v. Ford Motor Credit Co. (In re McFarland)*, 131 B.R. 627 (E.D. Tenn. 1990), *aff'd,* 943 F.2d 52 (6th Cir. 1991), Judge Stair held that the vehicle was not property of the estate since the condition had not occurred when the petition was filed. *Id.* at 446-47. Although Judge Stair did not specify the nature of the condition, it is clear that the language quoted above constituted a condition precedent.[7] In these cases, on the other hand, all of the conditions are conditions subsequent. Accordingly, the *Branam* decision is not inconsistent with this opinion.

---

[7] The court also notes that the *McFarland* decision upon which Judge Stair relied did characterize the condition in that case as a condition precedent.

-12-

**C.**

None of the conditions in the agreements that would have permitted Auto Loan Finance to rescind the sale transaction had occurred by the times the debtors sought bankruptcy relief. It follows that the rule of section 2-401(1) of the Uniform Commercial Code applies and makes clear that the creditor's purported retentions of title were effective only to reserve security interests in the vehicles, with the debtors receiving title upon delivery. This conclusion is buttressed by the requirement that a security interest does not attach until the debtor has rights in the collateral, Code Ga. Ann. § 11-9-203(a), (b)(2), and the fact that Auto Loan Finance submitted title applications asserting that it held security interests in the debtors' vehicles. The court holds, therefore, that the vehicles became property of the debtors' bankruptcy estates upon their filing of bankruptcy petitions.

**III.**

For the foregoing reasons, the court will deny the motions for relief from the automatic stay to the extent that they are based on assertions that the vehicles are not property of the estates.

###